In the Matter of the Estate of ELLA MICHELBACHER, Deceased.*

Surrogate's Court, New York County, August 23, 1927.

---

* Decree of surrogate revd., 226 App. Div. 858; affd., 253 N. Y. 515.

*Townsend & Guiterman,* for the objecting next of kin, Cora Guiterman and Doris R. Sloss.

*Frank, Weil & Strouse,* for the executor.

EDWARD B. SCHULKIND, Referee. On the judicial settlement of the final account of the executor, various objections were filed by Cora Guiterman, daughter of the decedent, and Doris Sloss, a granddaughter. The executor, Abraham J. Michelbacher, is a son of the decedent. The persons named were the only next of kin of decedent.

The issue, in the main, before me is the quite usual one of determining whether or not the executor has failed to schedule property of the decedent in his account, which he claims as his own. In this instance, the question involves the stock of the Ruella Realty Corporation which acquired the title to the premises known as 227–229–231 East Seventy-second street, Nos. 306–308 West One Hundred and Twelfth street, No. 100 West One Hundred and Eighteenth street, and 153 Lenox avenue, all in the borough of Manhattan, New York city, and a certain mortgage for $10,000. An issue with reference to a $10,000 note made by the executor to the decedent has been eliminated by the admission of liability made during the hearings.

Solomon Michelbacher, the husband of the decedent, during his lifetime, owned the aforementioned real estate. He had been speculating for some period of time, with the result that at the time of his death he owed considerable sums of money to members of his family, the banks and others. Within six months prior to his death

in 1916, he conveyed the real estate to Ella Michelbacher, the decedent. Mrs. Michelbacher, at the time, was a woman of about sixty-seven years of age, quite deaf and entirely inexperienced in business matters of any kind.

In 1916 real estate was in one of its periodic slumps, when mortgage loans and tenants were difficult to get, and upkeep expenses high. In fact, the condition of Mr. Michelbacher's properties was bad. With these conditions existent, the mother, immediately after the death of the father, naturally turned to her son for guidance and direction. She requested him to look after her affairs. He testified that he made an investigation of the properties during the months of August, September and October, 1916, for which he charged her $200 per month. At the conclusion of his investigation, he told her that the properties were in poor condition, and that it would require substantial moneys to rehabilitate them. She was further told by him that there was grave danger of losing all the properties unless something was done immediately. In response to her question as to what she should do, he advised her, in substance, to turn the property over to a corporation he proposed to organize, of which he was to own all of the stock, as he would not undertake the management of the properties unless they belonged to him. His testimony is as follows on this point (Stenographer's Minutes, p. 5): " I thought I could attend to her affairs and my own at the same time, but I could not, and at her request, I gave my entire time and attention to her matters and I devoted three months, August, September and October, to doing it, and when the renting season was over in October and I hadn't been able to get tenants, I saw that it was futile to try to operate that way and I told my mother so. I showed her the amount of yearly rentals she would derive based on monthly rentals and expense, which would show considerable deficit, and I told her the only way this property ever will turn out to be profitable is to spend a lot of money on it. I told her I couldn't afford to work for nothing and you cannot afford to throw money away— what's going to be done, and she asked me what do you suggest, and I suggested that I form a corporation and take over this property, but I will only do it in case it belongs to me, because if I put my time and attention to this thing and it ever pans out to be worth something, I want the profit. Of course, I will take care of you during your lifetime, and she agreed readily."

Again he testified (Stenographer's Minutes, p. 13): " Q. Was it necessary as an inducement for you to take this property that your mother and brother-in-law each advance $10,000 to you? A. Positively. Q. You would not have taken it otherwise? A. Positively."

This further condition for his taking over the properties was that a loan of $20,000 be made on a blanket mortgage on all the properties with which the needed repairs could be made. Before following out this plan, but after her full consent was obtained, the son suggested that he take her down to see the lawyer with whom he had discussed this matter for some time, which was done. The final result was that the Ruella Realty Corporation, with a capital stock of $5,000, was organized, the properties conveyed to it, and the stock issued to Abraham J. Michelbacher. A letter was also prepared containing a provision that the son was to pay the mother $5,000 and fifty per cent of the net rentals during her life. At the time of the conveyance or immediately thereafter, she paid all the charges against the buildings. At the same time, the son borrowed $10,000 from the mother, one-half of which he used to pay for the stock of the Ruella Realty Corporation and the other $5,000 he banked in his own account. This loan is evidenced by the note on which liability has been admitted. The loan of $20,000 as requested for repairs and improvements was made on a blanket mortgage on the properties. Of this loan, $10,000 was made by the mother · and $10,000 by Mr. Rudolph Guiterman, a son-in-law of the decedent. The mother was required to guarantee the payment of the $10,000 loaned by Guiterman.

The executor spent $25,000 during 1917 on repairs and improvements, of which $20,000 was the proceeds of the loan from the mother and brother-in-law, and he states the other $5,000 was from rents and a loan from the bank. He claims that a deficit occurred in 1917 of $20,782 and in 1918 of $16,268. This appears more striking than true. In 1917 he charged against the rents as operating expenses the entire $25,000 expended for improvements, of which at least $20,000 came from his mother and brother-in-law. Against this year he also charged a $5,200 payment made in reduction of a mortgage, and unpaid salary to himself of $5,750. To arrive at the 1918 deficit, he deducts as operating expense $5,400 representing an amount used in reduction of a mortgage, $7,300 salary voted to himself, and an item of $10,000 for an alleged loan, of which no details are mentioned in his statements, although all items of interest, taxes, operating cost, repairs and improvements are itemized and deducted as operating expenses. (Petitioner's Exhibit U.) He admits in his testimony that, in 1918, items of improvement were made that were not usual and might not be necessary for some years to come. It is on figures such as these that the deplorable condition of things was, no doubt, pictured to the mother during the years 1917 and 1918.

However, during 1918 and 1919, the real estate pendulum began

to swing upward again, and with it the properties rose in value and the rentals increased, with the result that the first half of 1919 showed a substantial profit. In the interval between 1916 and 1919 the executor drew small sums of money on account of his salary of $5,200 a year voted him by the corporation, but managed to clean up all back compensation by 1921. The mother, however, had not received any moneys during these intervening years. In 1919, when values were rising, and profits were evident, he told her that there was a prospect of a sale of the Seventy-second street houses, but that this was impossible with the provision in the deed entitling her to fifty per cent of the net rentals, and induced her to relieve the corporation from the undertaking, making his personal promise to pay her $2,500 a year. She acquiesced in this, as she had in everything else. In 1923 all the properties were sold except the One Hundred and Eighteenth street and Lenox avenue property, and $115,000 over the mortgages was realized. From 1919 to the time of her death in 1924, the mother had not received the $2,500 a year, as promised her, but received only small sums of money which he doled out to her as she needed it, these amounting in five years to $7,300. At the same time, it should be noted that the son did not pay the mother any interest on the $10,000 note.

At the time of the sale of the houses, the blanket mortgage of $20,000 was canceled, and Rudolph Guiterman was paid his $10,000 and the mother received back a one-year purchase-money second mortgage on one of the properties. Later, at the son's suggestion, this mortgage was transferred to him with the result that the mother had no property of any kind left. The explanation for the transfer of this mortgage is contained in a letter prepared by the son and signed by the mother in which she says, " You are to get this money for the work you have done in taking care of my affairs."

The son had no real estate experience. His success in his various ventures before undertaking the management and investigation of the real estate was, to say the least, doubtful. During the whole time that he managed the real estate, he considered his services worth $5,200 a year, although the regular charge for managing real estate by experienced real estate firms is a small percentage on rent collected and leases made.

At the time of her husband's death, the mother had received $35,000 from insurance on her husband's life and certainly could have financed any improvements herself through competent and reliable real estate firms.

The relationship between the mother and son was one of great confidence and trust. The executor himself states this. At page 234 of the minutes he testified: " Q. Your mother was readily

influenced by you, was she not? A. I think she was. She had every confidence in me and if I told her to do a thing, she would have done it. That's why I would not let her do it, without consulting with Mr. Weil."

The son ran her bank account under a power of attorney, and she never wrote a letter with reterence to any of the matters in connection with the properties herein unless he prepared the draft and she copied it. She was absolutely dependent upon him for his guidance and advice. At page 35 of the minutes he testified: " Q. Your mother was not a business woman? A. She never signed a check until I insisted she open a bank account to take care of household expenses. She didn't know how."

There is a wearisome monotony of evidence throughout the record proving that the son's suggestion was equivalent to the mother's act. After the opportunity I had of observing the executor, there is no doubt in my mind that he is a man of strong personality and a person who plans out each course of action most carefully.

The decedent made her will in November, 1916, after she conveyed the real estate to Ruella Realty Corporation, by which she bequeathed her property as follows: Four-tenths to her son, Abraham, three-tenths to her daughter, Cora Guiterman, and three-tenths to her granddaughter, Doris Sloss. At the same time the attorney prepared a letter which was signed by the decedent, which read in part as follows: " Since you have stated to me that you are prepared if I die, to make such disposition of the Ruella Realty Corporation stock, which you hold, as I may desire, since the property was transferred to it for a relatively small amount, and I loaned you the moneys which have enabled you to acquire the company, I desire to express my wishes as follows:

" I should like Cora to receive 15 shares of the stock. I should like Doris to receive 15 shares of the stock, and for you to receive the balance."

It is significant in this connection that the division of the stock of the Ruella Realty Corporation mentioned in the letter is in exactly the same proportion among the same persons as in the will. It is true, however, that in this letter the mother states: " I have no doubt that you will respect my wishes as outlined in this letter, but I wish it distinctly understood that I am laying no obligation whatever upon you to do anything that you do not wish freely to do." I attach no importance to this last paragraph. The will and letter were prepared by the attorney who was fully acquainted with the financial affairs of Solomon Michelbacher, and the real properties of the decedent, their condition, and the contemplated transfer thereof to Abraham Michelbacher. It was a matter of

concern that there were unpaid creditors of Solomon Michelbacher and the transfer of his properties to his wife might be attacked as fraudulent. There is no doubt that this paragraph was intended to forestall any claim by a creditor of Solomon Michelbacher that the stock was the property of Ella Michelbacher. I do not see how any other inference can be drawn from the evidence.

I have carefully examined the evidence, the briefs of counsel and the mass of exhibits in evidence. The only conclusion to be reached therefrom is that the stock of the Ruella Realty Corporation and the mortgage for $10,000 are the property of the estate, and that the son held them as trustee for the decedent. The Ruella Realty Corporation was a mere instrument adopted by the executor to effectuate his purpose to deprive his mother of all her property to the exclusion of the daughter and granddaughter. There is no doubt that Mrs. Michelbacher had no idea or intention of giving the property to her son. He merely used his position and the confidence imposed in him by his mother in his scheme to procure her property. Every bit of evidence in the case points directly to a well-planned scheme by a dominant personality to deprive the mother of everything in cash, real estate or personalty, except the little bank account for household expenses.

Even under the testimony of the executor, the transfers bear no resemblance to a voluntary gift from mother to son. The transfer was exacted from her in the stress of her circumstances and under his representations that all would be lost unless it was made. His advice was not disinterested, nor was it fair. Even if he had intended to perform his promise to pay her one-half of the income, the transaction was palpably unfair, since the work of rehabilitation and management could have been done by some experienced real estate firm with at least equal success and at a much less compensation than the executor's salary of $5,200 and the mother been left with the whole of the net income and with the ownership of her property. Upon these facts, the law is plain.

It seems to me that when the mother requested the son to look into the situation with reference to her property and to advise her, and he undertook this, for which he received a compensation, he was undertaking what amounted to a fiduciary relationship. He, in effect, became her agent, and, when his advice to her resulted in benefit or advantage to himself, the transaction was voidable at her election and he should not be permitted to keep the profits. A trustee cannot act for himself, irrespective of whether he acts fairly or not. There was an incapacity to act.

In *Dutton* v. *Willner* (52 N. Y. 312) RAPALLO, J., said (at p. 318): "It is a well settled and salutary rule that ' a person who undertakes

to act for another in any matter shall not, in the same matter, act for himself.' * * * One consequence of a violation of the rule is that the agent must, at the option of his principal, account to him for any profit he may have made by the transaction. It matters not how fair the conduct of the agent may have been in the particular case, nor that the principal would have been no better off if the agent had strictly executed his power, nor that the principal was not in fact injured by the intervention of the agent for his own benefit. If the agent deals with the subject matter of his agency, or, by departing from the instructions of his principal, obtains a better result than could have been obtained by following them, the principal can claim the advantage thus obtained, even though the agent may have contributed his own funds or responsibility in producing the result."

In *Munson* v. *Syracuse, Geneva & Corning R. R.* (103 N. Y. 58, at p. 74) ANDREWS, J., said: " The law permits no one to act in such inconsistent relations. It does not stop to inquire whether the contract or transaction was fair or unfair. It stops the inquiry when the relation is disclosed, and sets aside the transaction, or refuses to enforce it, at the instance of the party whom the fiduciary undertook to represent, without undertaking to deal with the question of abstract justice in the particular case." (*Wendt* v. *Fischer*, 243 N. Y. 439.)

I need not go this far, however, to charge the executor with the property. In any event, this is a plain case of constructive fraud. The relationship between the mother and son was one of extreme confidence and trust. She depended upon his advice entirely. He kept her bank account, he advised her about the real estate, and every detail of the business cares and affairs of her life, after the death of the husband, were left solely to him. Under these circumstances, the law, as laid down in *Cowee* v. *Cornell* (75 N. Y. 91), is applicable, where HAND, J., said (at pp. 99 to 100 of 75 N. Y.): " It may be stated as universally true that fraud vitiates all contracts, but as a general thing it is not presumed but must be proved by the party seeking to relieve himself from an obligation on that ground. Whenever, however, the relations between the contracting parties appear to be of such a character as to render it certain that they do not deal on terms of equality but that either on the one side from superior knowledge of the matter derived from a fiduciary relation, or from overmastering influence, or on the other from weakness, dependence, or trust justifiably reposed, unfair advantage in a transaction is rendered probable, there the burden is shifted, the transaction is presumed void, and it is incumbent upon the stronger party to show affirmatively that no deception was practiced, no

undue influence was used, and that all was fair, open, voluntary and well understood." (*Bronx County Trust Co.* v. *O'Connor,* 220 App. Div. 340; *Allen* v. *La Vaud,* 213 N. Y. 322; *Ten Eyck* v. *Whitbeck,* 156 id. 341, 353; *Green* v. *Roworth,* 113 id. 462, 470; *Matter of Smith,* 95 id. 516, 522; *Matter of Booth,* 215 App. Div. 516, 521.)

This the executor has not done. His reasons have not impressed me at all. His attempts to justify his dealings with his mother and prove his fairness bring no conviction. His evidence merely accentuated a well-defined scheme to take unto himself his mother's property, and make sure that his sister and niece, who were always in his mother's mind, would receive no share of the estate. His preciseness and care in having all communications with his mother in writing, dictated by himself, corroborates my belief that his scheme was well laid.

My conclusion is that the $10,000 mortgage and the stock in the Ruella Realty Corporation belong to the estate. The executor should be directed to account therefor.

There is no issue with reference to the $10,000 note, as liability was admitted; he should be charged with that amount too.

Objection No. 3 need not be decided, in view of my conclusion.

Objection No. 5, with reference to the payments to the Corn Exchange Bank and two lawyers, is overruled, as I find the amounts paid to be proper charges against the estate.

FOLEY, S. The referee's report will be modified by my determination that the executor is not chargeable with the stock of the Ruella Realty Company, Inc., or the $10,000 mortgage. The evidence in the record is insufficient to set aside the original conveyance of the real property by the decedent, or to sustain the finding that the stock of the Ruella Realty Company, Inc., or the aforesaid mortgage transferred to the son, the executor, are assets of the estate for which he is accountable. While there is much justification upon moral and ethical grounds for the criticism by the referee of the motives and actions of the son, the surrogate is unable to decree any legal liability against him. He has seen fit to escape the moral obligation laid upon him by his mother in her letter of November 2, 1916, and has flouted her request to distribute part of the stock of the realty corporation to his sister and niece. The letter was precatory only and imposed no enforcible legal duty upon him. The proof fails to establish duress, undue influence, fraud or other ground for invalidity in the transactions between the decedent and her son. The authorities cited by the referee as sustaining this conclusion are not applicable to the

proofs adduced. In view of the admission of liability by the executor of the indebtedness of $10,000, the referee's report will be sustained in this particular. Because of the general conclusion reached by him, the referee has made no separate finding or conclusion with regard to objection No. 3. My modification of his report, however, requires the ascertainment of the balance due from the son to the estate under his personal contract of June 20, 1919, wherein he agreed to pay to his mother the sum of $2,500 per year for her life. If the parties can agree on or before the submission of the proposed decree as to the amount due under this contract, the decree may fix such liability. If they are unable to agree, the report will be remitted to the referee to fix and determine the amount. The testimony and exhibits fail to establish that any balance was due to the decedent or her estate on the prior contract for fifty per cent of the net profits of the realty company.

Submit decree on notice modifying report accordingly.